Filed 11/29/16 (unmodified opn. attached)

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHARMALEE GOONEWARDENE,<br><br>              Plaintiff and Appellant,<br><br>v.<br><br>ADP, LLC et al.,<br><br>              Defendants and<br>              Respondents. | B267010<br>(Los Angeles County<br>Super. Ct. No. TC026406)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on November 4, 2016 be modified as follows:

On page 24, line 20, change "1172-1174" to "1772-1774"

On page 25, lines 12 through 17, delete:

Under the principles discussed above, when a business enters into a contract with a service provider clearly aimed at aiding the business in

discharging its duty to supply information or benefits to certain individuals, those individuals constitute third party creditor beneficiaries of the contract between the business and service provider.

And substitute:

Under the principles discussed above, when an employer enters into a contract with a service provider by which the provider is to take over the employer's payroll tasks, including the preparation of the payrolls themselves, the employees  constitute third party creditor beneficiaries of the contract between the employer and service provider.

On page 45, line 14, following the sentence ending with the word "ADP," insert the following footnote:

In a petition for rehearing, ADP asserts that the economic loss rule bars the professional negligence claim.  As that contention was not raised prior to the filing of our opinion, it has been forfeited.  (*Alameda County Management Employees, Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 338, fn. 10.)

Moreover, we would reject the contention were we to consider it.  The economic loss rule provides that "'"[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.'" . . . "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." (*Robinson Helicopter Co. v.*

*Dana Corp.* (2004) 34 Cal.4th 979, 988.)  Under the rule, a plaintiff is permitted to recover purely economic losses due to negligence in the performance of a contract if a "'special relationship'" exists (*Greystone Homes, Inc. v. Midtec, Inc.* (2008) 168 Cal.App.4th 1194, 1215), which may arise when the plaintiff, though not in privity to the contract, is a third party beneficiary of the contract and the *Biakanja* factors are appropriately present (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803-807; see *Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 605).  Under the allegations in the 6AC, that is the case here.

The petition for rehearing by respondents is denied.  The modification does not change the judgment.

_____

*EPSTEIN, P. J.,      WILLHITE, J.       MANELLA, J.,

3

Filed 11/4/16 (unmodified opn.)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHARMALEE GOONEWARDENE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ADP, LLC et al., <br><br> Defendants and Respondents. | B267010 <br> (Los Angeles County <br> Super. Ct. No. TC026406) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William Barry, Judge.  Affirmed in part, reversed in part and remanded with directions.

Glen Broemer for Plaintiff and Appellants.

Morgan Lewis & Bockius, Robert A. Lewis, Thomas M. Peterson and Zachary Hill for Defendants and Respondents.

_____

In the underlying action, appellant Sharmalene Goonewardene's fifth amended complaint asserted claims against respondents ADP, LLC, ADP Payroll Services, Inc. and AD Processing, LLC for wrongful termination, violations of the Labor Code, and related causes of action, including breach of contract, negligent misrepresentation, and negligence. The trial court sustained respondents' demurrers relating to the fifth amended complaint without leave to amend. Appellant contends the court abused its discretion in denying her leave to amend, arguing that her proposed sixth amended complaint states claims against respondents. We conclude that the proposed complaint states claims against respondents only for breach of contract, negligent misrepresentation, and negligence. We therefore affirm the trial court's ruling in part, reverse it in part, and remand with instructions to permit appellant to file a complaint against respondents asserting those claims.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

In April 2012, appellant commenced the underlying action. Her initial complaints named as defendants a

California corporation and New York corporation bearing the same name -- Altour International Inc. -- and Alexandre Chemla, who was alleged to be the corporations' alter ego (collectively, Altour). The complaints asserted claims for wrongful termination, breach of contract, violations of the Labor Code, and related causes of action predicated on allegations that appellant was employed by Altour, which failed to compensate her in accordance with the Labor Code and wrongfully terminated her when she brought that misconduct to its attention.

In March 2015, appellant filed her fourth amended complaint (4AC), which, in addition to the claims previously alleged against Altour, included a single cause of action against respondent ADP, LLC, namely, a claim for unfair business practices under the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.). In connection with that claim, the complaint alleged that ADP, LLC, failed to provide appellant with adequate documentation and records regarding her compensation.

After ADP, LLC, demurred to the 4AC, appellant informed the trial court that she wished to assert additional claims against ADP, LLC. The trial court deferred ruling on the demurrer to permit appellant to submit a motion for leave to file the fifth amended complaint (5AC), which contained claims against all three respondents for wrongful termination, violations of the Labor Code and federal labor laws, breach of contract, unfair business practices, false advertising, negligence, and negligent misrepresentation.

The 5AC alleged that respondents entered into a contract with Altour to provide payroll services relating to Altour's employees. Several claims in the 5AC also effectively asserted or alleged that all respondents acted as appellant's employer.

In ruling on the pending demurrer to the 4AC and the motion for leave to file the 5AC, the trial court sustained the demurrer to all claims founded on the assumption that ADP, LLC was appellant's employer, co-employer, or joint employer. The court denied appellant leave to amend with respect to those claims, and ordered them dismissed with prejudice. The court otherwise permitted appellant to file the 5AC, on the condition that appellant assert only the remaining claims against respondents.

The 5AC nevertheless contained claims predicated on the assumption that ADP Payroll Services Processing, Inc. and AD Processing, LLC were appellant's employers. Respondents demurred to the 5AC, contending the employer-based claims were defective, and the remaining claims against respondents were untenable. The trial court sustained the demurrer without leave to amend, and asked respondents to prepare the final order reflecting its ruling.

While that order was pending, appellant submitted a motion for reconsideration and a proposed sixth amended complaint (6AC), which materially resembles the 5AC, as originally proposed. The 6AC contains claims similar to those in the original 5AC -- including the claims relying on the theory that respondents were appellant's employers --

4

with additional factual allegations.  The motion for reconsideration requested leave to file the 6AC.  On August 5, 2015, without expressly denying the motion for reconsideration, the trial court entered a final order sustaining respondents' demurrer to the 5AC without leave to amend, and a judgment of dismissal in favor of respondents.  This appeal followed.

## DISCUSSION

Appellant contends the trial court erred in sustaining respondents' demurrer to the 5AC without leave to amend. As explained below, we agree with the trial court that the majority of appellant's claims must be dismissed.  However, we conclude the proposed 6AC adequately pleads claims for breach of contract, negligent misrepresentation, and negligence based on allegations that respondents performed payroll services for appellant's benefit in an inaccurate and negligent manner.

### A.  *Standard of Review*

"Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal.  [Citation.] . . .  Appellate courts first review the complaint de novo to determine whether or not the . . . complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to determine whether or not the trial court erroneously

5

sustained the demurrer as a matter of law.  [Citation.]"
(*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857,
879, fn. omitted (*Cantu*).)  We do not assess the credibility of
the allegations, as "'it is wholly beyond the scope of the
inquiry to ascertain whether the facts stated are true or
untrue.'"  (*Garton v. Title Ins. & Trust Co.* (1980) 106
Cal.App.3d 365, 375 quoting *Colm v. Francis* (1916) 30
Cal.App. 742, 752.)

"Second, if a trial court sustains a demurrer without
leave to amend, appellate courts determine whether or not
the plaintiff could amend the complaint to state a cause of
action.  [Citation.]"  (*Cantu, supra,* 4 Cal.App.4th at p. 879,
fn. 9.)  To establish an abuse of discretion regarding the
denial of leave to amend, "a plaintiff may propose new facts
or theories to show the complaint can be amended to state a
cause of action . . . ."  (*Connerly v. State of California* (2014)
229 Cal.App.4th 457, 460.)

That showing may be made by way of a motion for
reconsideration.  (*Mogilefsky v. Superior Court* (1993) 20
Cal.App.4th 1409, 1418.)  Furthermore, the "showing need
not be made in the trial court so long as it is made to the
reviewing court."  (*Careau & Co. v. Security Pacific Business
Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1386 (*Careau &
Co.*).)

B.  *Scope of Review*

At the outset, we examine the scope of our review of
the ruling on the 5AC.  The trial court's grant of

6

respondents' demurrer to the 5AC without leave to amend effectively barred appellant from filing the 6AC.  Thus, our review examines whether the trial court erred in denying leave to amend the 5AC.

Although appellant's opening brief seeks a reversal of the trial court's  rulings "as to every cause of action," she does not, in fact, attack the portion of those rulings sustaining the demurrers to the 5AC.  Her brief contains no argument (supported by legal authority and citations to the record) aimed at showing any claim in the 5AC is tenable.[1] Rather, appellant's focus is on whether the trial court erred in denying leave to amend.  In this regard, she argues that the trial court improperly declined to grant her motion for reconsideration, urges us to evaluate the allegations in the 6AC, and contends those allegations state causes of action. Accordingly, appellant has forfeited her challenge to the rulings on the 5AC, insofar as the court sustained demurrers to the claims in that complaint.  (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1504; see *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784.)

The remaining issue is whether appellant may challenge the denial of leave to amend on appeal, as the record reflects no oral request for leave to amend at the

_____

[1]      Appellant's sole express citations to the 5AC occur in her reply brief, in the context of arguments intended to support the 6AC's allegations and to show that certain purported defects are curable by amendment.

7

hearing on the demurrer to the 5AC, and shows only that appellant sought to file the 6AC by means of a motion for reconsideration submitted while the final ruling on the demurrer to the 5AC was pending. In *Careau & Co.*, the plaintiffs in two consolidated actions filed first amended complaints, to which the defendants demurred. (*Careau & Co.*, *supra*, 222 Cal.App.3d at p. 1379.) After the trial court sustained the demurrers without leave to amend, the plaintiffs filed motions for reconsideration of the denial of leave to amend, accompanied by proposed second amended complaints. (*Id*. at pp. 1379-1380.) The trial court denied reconsideration, filed orders stating the grounds for the demurrers, and later entered judgments in favor of the defendants. (*Id*. at pp. 1380-1381.) Although the record reflected no request for leave to amend at the hearing on the demurrers, the appellate court concluded that in view of the reconsideration motions, it was appropriate to examine whether the second amended complaints stated causes of action. (*Id*. at pp. 1386-1387.)

We reach the same conclusion here and, accordingly, examine the 6AC in order to determine whether it states a claim against respondents (henceforth, collectively, ADP).[2]

---

[2] ADP suggests that appellant may not challenge the denial of leave to amend because her motion for reconsideration was "premature." In view of the liberal policy permitting a party to show on appeal that an amended complaint states a cause of action, that contention fails. (*Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 550

8

C. *Facts*[3]

The 6AC alleges the following facts:  ADP is a payroll services provider.  Since 2000, ADP's advertising and corporate statements have stated that it provides payroll-related services to employers and employees.  ADP offers to "'serve as an extension of [an employer's] payroll department and [to] take over all [the employer's] payroll tasks."  ADP holds itself out as possessing specialized knowledge regarding the calculation of wages under applicable wage laws and regulations, and states that it "can save employer[]s['] money by calculating their payroll."  ADP's Web site advertises its expertise in tracking employee work hours, determining wages, and preparing payrolls in accordance with applicable laws.  According to the Web site,

["[A]buse of discretion in sustaining a demurrer without leave to amend is reviewable on appeal even in the absence of a request for leave to amend"].)

[3]    we observe that the prolix and poorly organized 6AC ignores the rule that "the complaint must contain a statement of the facts in ordinary and concise language . . . ." (*M.G. Chamberlain & Co. v. Simpson* (1959) 173 Cal.App.2d 263, 267.)  In such cases, we "disregard any defects in the pleading which do not affect the substantial rights of the parties," and assess whether "there are averments of ultimate facts sufficient to constitute a cause of action . . . ." (*Ibid.*)

ADP provides "'self-service tools'" allowing employees to view their attendance, vacation benefits, and time card approvals.

At some point, ADP entered into an unwritten contract with Altour, which provides travel-related services. Under that agreement, ADP calculated payrolls, maintained employee records, offered legal advice, and provided other wage-related services for the benefit of Altour and its employees. According to the 6AC, ADP entered into "a partnership or joint venture with Altour for the purpose of handling Altour's payroll and maintaining records and confidential information regarding Altour's employees." (Underscoring omitted.)

Appellant's ethnicity is Sinhalese and her nationality is Sri Lankan. In November 2005, appellant began her employment with Altour. She answered telephones, made airline, automobile, and hotel reservations, and issued electronic tickets and refunds. Because she worked on teams that provided services "24 hours a day 365 days of the year," she accrued overtime hours. Appellant "logged directly into an ADP system to track her earnings."

From 2005 to 2012, appellant did not receive the compensation due her, including overtime compensation, and she was denied meal and rest breaks required under Labor Code section 226.7. In addition, she was "treated differently as a result of her race, nationality[, and] ethnicity," as she was offered no promotions despite favorable work evaluations, and received less pay than a male counterpart.

Under ADP's agreement with Altour, the 6AC alleges, ADP maintained appellant's earnings records, added the hours on her time cards, calculated her earnings, and provided her with an earnings statement. ADP also was responsible for determining whether appellant was to receive, inter alia, overtime or double time (that is, overtime reflecting a doubled hourly rate of pay), in accordance with applicable labor laws. ADP alone was responsible for maintaining appellant's records relating to her compensation, adding the hours shown on her time cards, and applying the labor laws to determine her wages.

ADP failed to act with "even scant care" in calculating appellant's wages. (Underscoring omitted.) Her earnings statements provided by ADP never contained a breakdown of her regular hours, overtime hours or double overtime hours, and did not reflect data regarding meal and rest breaks. Although her time cards reflected facts requiring the payment of double time compensation, she received no such payment.[4] She was paid twice a month on a basis that was intentionally confusing and did not comply with the wage orders of the Industrial Welfare Commission (IWC).

---

[4] In connection with appellant's reply brief, she filed a motion to augment the record with certain documents intended to show that ADP's pay calculations failed to reflect overtime compensation owed her. As we conclude that the 6AC sufficiently alleges that fact (see pts. E., F. & G. of the Discussion, *post*), we deny the motion.

11

According to the 6AC, Altour and ADP knew that appellant was not being paid in accordance with California law.

Appellant reasonably relied on the earnings statements provided to her. In 2010, she noticed disparities between her own bookkeeping and her hours worked, as shown on her paychecks. In January 2012, she was terminated. According to the 6AC, she was terminated "on a pretext and in retaliation for [her] efforts to be paid fairly and to receive those benefits to which she was legally entitled."

D. *Claims Based on Theory That ADP Was Appellant's Employer*

The 6AC asserts several claims predicated on the theory that ADP was appellant's employer. Specifically, they allege or suggest (1) that ADP was subject to certain duties to appellant imposed on employers under California and federal law, and (2) that ADP was empowered to terminate appellant's employment. The claims assert violations of the Labor Code and the Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.), racial discrimination under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) and title VII of the Civil Rights Act of 1964 (title VII) (42 U.S.C. § 2000e et seq.), and wrongful termination in violation of public policy. As explained below, the claims fail for want of sufficient allegations establishing an employee-employer relationship between appellant and ADP.

1.  *Labor Code Claims*

We begin with appellant's claims under the Labor Code. The 6AC asserts claims against ADP for failure to make timely wage payments (Lab. Code, §§ 201, 201.3, 201.5, 202, 203, 205.5; second cause of action), failure to pay overtime compensation (Lab. Code, § 1194; tenth cause of action), and failure to issue adequate earnings statements (Lab. Code, § 226; eleventh cause of action).

ADP's liability under the claims hinges on whether ADP employed appellant within the meaning of the term "employ" in the applicable IWC wage order which the 6AC alleges to be Wage Order No. 4-2001 or Wage Order No. 9-2001 (*Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1428-1429 (*Futrell*). Those wage orders define the term "[e]mploy" as "to engage, suffer, or permit to work." (Cal. Code Regs., tit. 8, § 11040(2)(E), 11090(2)(D).) That definition incorporates "three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 64 (*Martinez*).) Generally, "[t]he essence of the common law test of employment is in the 'control of details.' A number of factors may be considered in evaluating this control, including: (1) whether the worker is engaged in a distinct occupation or business; (2) whether, considering the kind of occupation and locality, the work is usually done under the alleged employer's direction or without supervision; (3) the

13

skill required; (4) whether the alleged employer or worker supplies the instrumentalities, tools, and place of work; (5) the length of time the services are to be performed; (6) the method of payment, whether by time or by job; (7) whether the work is part of the alleged employer's regular business; and (8) whether the parties believe they are creating an employer-employee relationship. [Citations.]" (*Futrell*, *supra*, 190 Cal.App.4th at p. 1434.)

The application of the IWC's definition of "employ" to Labor Code claims against a payroll services provider was examined in *Futrell*. There, the plaintiff initiated a class action against a television commercial production company and its hired payroll services provider, asserting claims under the Labor Code and the applicable IWC wage order for failure to make timely wage payments, issue adequate pay statements, and pay overtime compensation (Lab. Code, §§ 203, 226, 1194), together with claims under the FLSA for failure to pay overtime compensation (29 U.S.C. §§ 207, 216). (*Futrell*, *supra*, 190 Cal.App.4th at pp. 1424-1425.) When the payroll services provider sought summary adjudication on the claims, the evidence established that it collected timecards from the plaintiff, placed that information in a computer system to create the plaintiff's paychecks, and maintained records relating to the plaintiff's compensation. (*Id.* at p. 1427.) The trial court granted summary adjudication on the claims, concluding that the payroll services provider was not the plaintiff's employer. (*Id.* at pp. 1429-1430.)

14

Affirming the ruling, the appellate court held that for purposes of the Labor Code claims, no employment relationship existed under the three definitions incorporated in the IWC's definition of the term "employ[]." (*Futrell, supra,* 190 Cal.App.4th at pp. 1424-1425.)  Regarding the first definition, the court determined that the payroll service provider's role in generating paychecks established no such relationship:  "[W]e conclude that 'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck.  This is the only definition that makes sense.  The task of preparing payroll, whether done by an internal division or department of an employer, or by an outside vendor of an employer, does not make [the preparer] an employer for purposes of liability for wages under the Labor Code wage statutes.  The preparation of payroll is largely a ministerial task, albeit a complex task in today's marketplace.  The employer, however, is the party who hires the employee and benefits from the employee's work, and thus it is the employer to whom liability should be affixed for any unpaid wages.  The extension of personal liability to the agents of an employer is not reasonably derived from the language and purposes of the Labor Code wage statutes." (*Id.* at p. 1432.)

The court further determined that no employment relationship existed under the remaining definitions. Regarding the second definition, the court concluded that the

payroll service provider did not "suffer or permit" the plaintiff "to work," as there was no evidence it "had the power to either cause him to work or prevent him from working." (*Futrell, supra,* 190 Cal.App.4th at p. 1434.) Regarding the third definition, the court concluded that the record reflected no common law employment relationship because the payroll service provider lacked control over the circumstances of the plaintiff's work. (*Id.* at pp. 1433-1434.)

We find *Futrell* persuasive and apply its analysis in assessing the Labor Code claims in the 6AC. In an apparent effort to establish that ADP exercised a type of control over appellant required for an employment relationship, the 6AC alleges that ADP, by "partnering with or attaching itself to Altour's business and taking over a variety of employer functions, . . . essentially became [appellant's] employer at least in the area in which it maintain[ed] control . . . ." Because that allegation represents a legal conclusion, we disregard it, and examine whether the facts pleaded in 6AC establish an employment relationship. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 953.) As explained below, they do not.

The allegations in the 6AC demonstrate only that ADP took over the functions ordinarily assigned to an employer's internal payroll department, which is not properly regarded as an additional employer. (*Futrell, supra,* 190 Cal.app.4th at pp. 1424-1434.) Nothing in the 6AC suggests ADP had "the power or authority to negotiate and set [appellant's] rate of pay." (*Futrell, supra,* 190 Cal.app.4th at p. 1432.) On

16

the contrary, the 6AC asserts a claim for breach of contract *solely* against Altour (fourth cause of action), alleging that appellant entered into written and oral agreements with it, and that from 2005 to 2012, Altour repeatedly breached the agreements "by failing to pay [her] in accord with the *agreed upon* rate in . . . pay." (Italics added.)  Furthermore, notwithstanding the wrongful termination claim asserted against ADP, the 6AC contains no factual allegations that ADP had the power to hire or fire appellant or control the circumstances of her work.  Indeed, in the 6AC and on appeal, appellant asserts only that ADP exercised a specific type of control over the payment of her compensation.  As discussed below, that purported control does not render ADP her employer.

Appellant contends ADP undertook an employment relationship with her because the 6AC assigns a broader range of responsibilities to ADP than attributed to the payroll service provider in *Futrell*.  The 6AC alleges that under ADP's contract with Altour, ADP was exclusively responsible for determining how appellant's salary was to be calculated under applicable laws.  Indeed, according to appellant's opening brief, Altour played no role in the calculation of her wages, aside from providing her time card data to ADP.  The brief states that Altour "did *nothing more* than transmit time card information prepared by [appellant] to ADP, and by design ADP exercised complete control over the amount [appellant] was actually paid."  (Italics added.)  Relying on those allegations, appellant maintains that ADP's

responsibilities in applying the governing laws were not ministerial, arguing that ADP's exercise of judgment regarding those laws necessarily "'influenced' a key term of [her] employment, [namely], how much she was to receive in exchange for her labor."

Appellant's contention fails, as ADP's influence is not reasonably regarded as "'control over wages,'" for purposes of IWC's definition of the term "employ." That definition refers to "the power or authority to negotiate and set an employee's rate of pay," that is, the basic discretionary right to select the rate of pay from a range of potential values. (*Futrell*, *supra*, 190 Cal.App.4th at p. 1432.) The allegations of the 6AC fail to establish that ADP had such power. Rather, ADP's influence arose solely through Altour's duties under the Labor Code and the applicable wage orders, which specified how appellant's pay was permissibly calculated once she and Altour agreed upon her rate of pay. Because those duties identify the appropriate lawful "time and manner of paying wages" and "mandatory overtime pay" (*Cuadra v. Millan* (1998) 17 Cal.4th 855, 858, abrogated on another ground in *Samuels v. Mix* (1999) 22 Cal.4th 1, 16, fn. 4), they are not discretionary, but mandatory (*Redwood Coast Watersheds Alliance v. State Bd. Of Forestry & Fire Protection* (1999) 70 Cal.App.4th 962, 970 [discretionary acts are those regarding which there is no hard and fast rule as to the course of conduct that one must or must not take]). Accordingly, in undertaking to determine appellant's compensation in compliance with those duties, ADP acquired

no basic discretionary right to set appellant's rate of pay. Rather, ADP's alleged deviations from the lawful determination of appellant's compensation constituted errors by ADP, not the exercise of a right. ADP's conduct under its agreement is thus properly characterized as ministerial. (*Id*. at p. 970 ["A duty is ministerial when it is the doing of a thing unqualifiedly required"].) In sum, the 6AC fails to allege the employment relationship required for the Labor Code claims.

### 2. *FLSA Claims*

The 6AC asserts two claims against ADP under the FLSA for failure to pay overtime compensation (sixth and twelfth causes of action; 29 U.S.C. §§ 207, 216). ADP's liability under those claims hinges on whether there is an employer-employee relationship under the so-called "'economic reality test.'" (*Futrell, supra,* 190 Cal.App.4th at p. 1435.) That test, though distinct from the IWC's definition of the term "'employ'" (*Martinez, supra*, 49 Cal.4th at pp. 59-60), ordinarily involves the consideration of similar factors (*Futrell, supra*, 190 Cal.App.4th at p. 1435). In applying the test, courts examine "'the economic reality of a work relationship,'" with due attention to ""'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."'" (*Guerrero v. Superior Court* (2013)

213 Cal.App.4th 912, 928-929, quoting *Bonnette v. California Health and Welfare Agency* (9th Cir. 1983) 704 F.2d 1465, 1469-1470, disapproved on another ground in *Garcia v. San Antonio Metropolitan Transit Authority* (1985) 469 U.S. 528, 539.)

The FLSA claims fail in view of *Futrell*.  In affirming summary adjudication of the plaintiff's FLSA claims relating to overtime compensation, the court reasoned that under the economic reality test, the payroll services provider was not the plaintiff's employer, as it merely prepared his paychecks and maintained certain compensation records.  (*Futrell, supra*, 190 Cal.App.4th at pp. 1435-1436.)  That rationale applies here.  As explained above (see pt. C.1. of the Discussion, *ante*), according to the facts alleged in the 6AC, ADP acted as Altour's payroll department; it exercised no material control over appellant's rate of pay, terms of employment, or circumstances of work.  Accordingly, under the "economic reality" test, the 6AC fails to establish an employment relationship sufficient to support the FLSA claims.

### 3. *Discrimination Claims*

The 6AC contains claims against ADP for discrimination under FEHA (eighth cause of action) and title VII (ninth cause of action).  As these claims assert discrimination relating to appellant's employment, ADP is liable for the alleged discrimination only if it employed her. (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123 [FEHA prohibits only employers from engaging in

discrimination]; *Murray v. Principal Financial Group, Inc.* (9th Cir. 2010) 613 F.3d 943, 944 [plaintiffs may assert title VII discrimination claim against entity only if they are its employees].)  Although courts have applied a variety of specific tests to determine the existence of an employment relationship under the two statutory schemes, "[t]he common and prevailing principle espoused in all of the tests" directs attention to "the 'totality of circumstances' that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties." (*Vernon*, *supra*, 116 Cal.App.4th at p. 124.)  As explained above, the circumstances surrounding appellant's work did not demonstrate an employment relationship between her and ADP.  Accordingly, the 6AC states no discrimination claims against ADP.

> 4.  *Claim for Wrongful Termination in Violation of Public Policy*

The 6AC's claim charging ADP with appellant's wrongful termination in violation of public policy (fifth cause of action) fails for similar reasons.  The claim alleges that when appellant sought the compensation due her, Altour and ADP discharged her, in contravention of public policy incorporated in the Labor Code favoring timely payment of all wages owed.  That claim, however, "can only be asserted against *an employer*." (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 900.)  In sum, the claims in

the 6AC predicated on the theory that ADP employed appellant are fatally defective, as the allegations establish no employee-employer relationship between appellant and ADP.

E.   *Breach of Contract Claim Predicated on Third Party Beneficiary Theory*

The 6AC contains a breach of contract claim against ADP predicated on the theory that appellant and other Altour employees were third party beneficiaries of the agreement between Altour and ADP (eighteenth cause of action).  For the reasons discussed below, we conclude the claim is adequately pleaded.

Civil Code section 1559 provides:  "A contract, made expressly for the benefit of a third person, may be enforced by him [or her] at any time before the parties thereto rescind it."  Here, "'"[e]xpressly,' . . . means 'in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.'"  [Citations.]  "[A]n intent to make the obligation inure to the benefit of the third party must have been clearly manifested by the contracting parties.'"  [Citation.]" (*Schauer v. Mandarin Gems of Cal.* (2005) 125 Cal.App.4th 949, 957-958.)  For that reason, the statute "'excludes enforcement of a contract by persons who are only incidentally or remotely benefited by it.  [Citations.]'" (*California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, 1137 (*California Emergency Physicians Medical Group*).)

22

A third party may have enforceable rights under a contract as either a creditor beneficiary or a donee beneficiary.  (*Lake Almanor Associates L.P. v. Huffman-Broadway Group, Inc.* (2009) 178 Cal.App.4th 1194, 1199.) "A person cannot be a creditor beneficiary unless the promisor's performance of the contract will discharge some form of legal duty owed to the beneficiary by the promisee." (*Martinez v. Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400.)  In contrast, "[a] person is a donee beneficiary only if the promisee's contractual intent is either to make a gift to him or to confer on him a right against the promisor."  (*Id.* at pp. 400-401.)

Because "[t]hird party beneficiary status is a matter of contract interpretation" (*California Emergency Physicians Medical Group, supra*, 111 Cal.App.4th at p. 1138), a party alleging a claim for breach of contract based on that status "must plead a contract which was made expressly for his benefit and one in which it clearly appears that he was a beneficiary" (*Luis v. Orcutt Town Water Co.* (1962) 204 Cal.App.2d 433, 441.)  The term "'express,'" as applied here, is subject to two pertinent qualifications.

First, to be an express third party beneficiary, a person "'need not be named or identified individually,'" as it is sufficient that the contract shows he or she "'is a member of a class of persons for whose benefit it was made.'" (*Spinks v. Equity Residential Brairwood Apartments* (2009) 171 Cal.App.4th 1004, 1023.)  In *Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1763 (*Soderberg*), a mortgage broker

23

engaged in the business of arranging investments in mortgage loans. In order to secure the plaintiff's investment in a specific loan, the broker arranged for an appraiser to provide the plaintiff with an appraisal of the net value of the pertinent property. (*Ibid*.) After the investment failed, the plaintiff learned that the property's true net value was far less than as appraised, and sued the broker and appraiser for breach of contract. (*Id*. at pp. 1763-1764.) When the trial court ruled that the complaint stated no claim against the appraiser, the plaintiff sought leave to amend to assert a third party beneficiary theory based on an alleged contract between the broker and the appraiser for the preparation of appraisal reports to be given to potential investors. (*Id*. at p. 1772.) The trial court denied that request, concluding that the alleged contract did not expressly designate the plaintiff as a third party beneficiary. (*Id*. at p. 1773.) Reversing, the appellate court concluded that the proposed amendment asserted a tenable third party beneficiary theory, even though the alleged contract did not specifically identify the plaintiff as a beneficiary. (*Id*. at pp. 1172-1174.)

Second, the status of a third party beneficiary does not require a written contract. In *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 606 (*Del E. Webb Corp*.), a general contractor asserted a claim for breach of contract against a construction materials supplier, contending it was the third party beneficiary of an oral contract between one of its subcontractors and the supplier. The general contractor's complaint alleged that "'in order to

24

provide [the subcontractor] with the roofing materials and other materials needed in the performance of the subcontract, and for the benefit of [the general contractor], [the supplier] agreed to supply any and all roofing materials and other materials necessary for the subcontract between [the general contractor] and [the subcontractor].'" (*Id.* at pp. 606-607.)  The appellate court held that a demurrer to the claim had been improperly sustained, concluding that the allegation was sufficient to plead the general contractor's status as a third party creditor beneficiary of the oral contract.  (*Id.* at p. 607.)

Under the principles discussed above, when a business enters into a contract with a service provider clearly aimed at aiding the business in discharging its duty to supply information or benefits to certain individuals, those individuals constitute third party creditor beneficiaries of the contract between the business and service provider.  (See *Martinez v. Socoma Companies, Inc.*, *supra*, 11 Cal.3d at p. 400; *Soderberg*, *supra*, 44 Cal.App.4th at pp. 1771-1774; *Del E. Webb Corp.*, *supra,* 123 Cal.App.3d at pp. 606-607.)  The 6AC articulates that theory.  The gravamen of its allegations is that Altour engaged ADP to discharge Altour's wage-related legal duties to its employees, that is, Altour's obligations under the Labor Code and applicable wage orders to accurately calculate employees' wages, fully distribute those wages in a timely manner, and provide employees with accurate  earnings statements.

25

The 6AC alleges that ADP, in its advertising, "expressly offers to partner with employers for their mutual benefit and for the benefit of employees." The 6AC further alleges that "Altour and ADP entered into an unwritten contract whereby ADP provided payroll calculation, records maintenance, legal advice and a host of related services to Altour for the benefit of Altour and its employees in the general area of employee wages and benefits." In this regard, the 6AC contains specific allegations that ADP provided services directly to Altour employees. The 6AC alleges that under the agreement, ADP added the hours on appellant's time cards, calculated her earnings, and provided her with earnings statements in connection with her compensation. Additionally, ADP allegedly was responsible for determining whether appellant was to receive overtime or double time in accordance with applicable labor laws. The 6AC thus alleges that Altour employees such as appellant are, at a minimum, third party creditor beneficiaries of the unwritten agreement.[5]

---

[5]    In addition to alleging that ADP's advertising "expressly offers to partner with employers for their mutual benefit and for the benefit of employees," the 6AC alleges that ADP provided services to employees not legally required, for example, a mechanism allowing employees to access information and track their earnings. Accordingly, the 6AC arguably also alleges that Altour employees are donee beneficiaries of the agreement.

26

The 6AC further alleges that that ADP breached its contractual obligations relating to Altour's wage-related duties to appellant, and that appellant suffered damages as a result. As elaborated below (see pt. F of the Discussion, *post*), the 6AC asserts that appellant was denied full compensation because ADP repeatedly failed to determine that she was owed overtime or double time pay, and otherwise provided inadequate earnings statements. Regarding these matters, the 6AC expressly attributes some of that alleged misconduct to ADP's own errors and misapplication of the applicable wage orders, rather than to mistakes in earnings data transmitted by Altour. Appellant has thus stated a breach of contract claim against ADP as a third party creditor beneficiary.[6]

Relying on *Martinez*, *supra*, 49 Cal.4th 35, ADP contends that as a matter of law, Altour employees cannot be third party beneficiaries of ADP's contract with Altour for the provision of payroll processing services. In our view, that broad proposition finds no support in *Martinez*. There, a farmer entered into contracts with merchants for the sale of his produce. (*Id.* at pp. 42-44.) Under the contracts, the farmer received advance payments that were to be retired

_____

[6]     In so concluding, we make no findings regarding the accuracy of the allegations in the 6AC. As explained above (see pt. A. of the Discussion, *ante*), for purposes of our review, we must accept the factual allegations in the 6AC as true.

from the revenues generated when his produce was delivered and sold; in addition, the farmer was entitled to a share of those revenues.  (*Ibid*.)  During the harvest season, the farmer failed to pay his field workers, who asserted Labor Code claims against the farmer and the merchants, contending all were their employers.  (*Id*. at p. 48.)  After the merchants secured summary judgment on the claims against them, our Supreme Court affirmed that ruling, determining that none of the merchants employed the workers.  (*Id*. at pp. 68-77.)  The court also rejected a contention that the workers were third party beneficiaries of one of the contracts, concluding that the terms of the contract manifestly placed sole responsibility for discharging wage-related duties on the farmer.  (*Id*. at p. 77.)  In contrast, according to the 6AC, under the unwritten contract between Altour and ADP, ADP undertook to discharge Altour's wage-related duties -- including the calculation of employees' wages and the provision of earnings statements -- to Altour's employees for their benefit.  In sum, the 6AC states a breach of contract claim against ADP predicated on a third party beneficiary theory.

F.  *Negligent Misrepresentation Claim*

The 6AC contains a negligent misrepresentation claim predicated on allegations that appellant's earnings statements, as provided by ADP, were inaccurate and omitted statutorily required information (thirteenth cause of

action). As explained below, we conclude that claim is sufficiently pleaded.

For a claim of negligent misrepresentation, "[a] plaintiff must prove the following in order to recover[:] '[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage. [Citation.]' [Citation.]" (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983, quoting *Home Budget Loans, Inc. v. Jacoby & Meyers Law Offices* (1989) 207 Cal.App.3d 1277, 1285.)

The tort requires a ""positive assertion."" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 854 (*OCM Principal Opportunities Fund*), quoting *Diediker v. Peelle Financial Corp.* (1997) 60 Cal.App.4th 288, 297-298.) The tort thus encompasses "'[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' [ citation], and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' [citations]." (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 174 (*Small*).) Furthermore, "when the defendant purports to convey the 'whole truth' about a subject, "'misleading half-truths"' regarding that subject may constitute positive assertions for the purpose of negligent

misrepresentation." (*OCM Principal Opportunities Fund*, *supra*, 157 Cal.App.4th at p. 854, quoting *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1081.)

The tort is also subject to a limitation applicable to claims against professionals such as auditors, attorneys, architects, engineers, and title insurers, who generally provide reports or opinions to clients on the basis of information supplied by the clients. (*OCM Principal Opportunities Fund, supra*, 157 Cal.App.4th at p. 856.) In *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408-415 (*Bily*), our Supreme Court held that an auditor who plays a "secondary" role in the preparation of a financial report for a client -- that is, who relies entirely on information provided by its client, and is subject to the client's "primary control of the financial reporting process" -- is liable only to a limited class of third parties for negligent representations contained in the financial report, viz., the class delimited in section 552, subdivision (2), of the Restatement Second of Torts.[7]

---

[7] Restatement Second of Torts section 552(2) provides that the liability of such parties is limited to the "loss suffered [¶] (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and [¶] (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." This limitation extends liability "only to those persons for whose benefit and guidance it is

(*Bily, supra,* 3 Cal.4th at p. 400.)  Under *Bily,* negligent misrepresentation claims against such professionals may be asserted only by "specifically intended beneficiaries of the report who are substantially likely to receive the misinformation." (*Murphy v. BDO Seidman* (2003) 113 Cal.App.4th 687, 694 (*Murphy*).)

Here, the 6AC alleges that ADP made positive untrue assertions regarding appellant's wages.  Under the agreement between Altour and ADP, ADP was responsible for "adding the hours on [appellant's] time cards," calculating her wages, and preparing her earnings statements.  Nevertheless,  according to the 6AC, from 2005 to 2012, appellant did not receive her full compensation. The 6AC attributes that misconduct directly to ADP, alleging that "[w]hile [appellant's] time cards often contained facts requiring the payment of double time, [she] did not receive a single double time payment . . . ."  The 6AC further asserts that the earnings statements ADP prepared failed to comply with Labor Code section 226, contained no breakdown of appellant's regular hours, overtime hours, or double time hours, and reflected an accounting method of her time that was intentionally confusing.[8]

---

supplied," as "distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it."  (Rest.2d Torts, § 552, com. h, pp. 132-133.)

[8]      Subdivision (a) of Labor Code section 226 provides in pertinent part:  "Every employer shall, semimonthly or at

31

Under these allegations, the wage statements provided by ADP, based on data supplied by Altour employees, contained positive inaccurate assertions that ADP could not reasonably have believed to be true. According to the 6AC, ADP miscalculated appellant's total wages by omitting double time payments owed her. In view of those alleged miscalculations, her earnings statements inaccurately stated her total wages, or alternatively, constituted misleading half-truths, as the earnings statements purported to convey the whole truth regarding her total wages. As ADP allegedly had the time card data necessary to calculate appellant's overtime, those misrepresentations were not reasonable.

Furthermore, under the allegations in the 6AC, ADP falls outside the limitation of liability applicable to

---

the time of each payment of wages, furnish each of his or her employees . . . an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee . . . , (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee . . . , (8) the name and address of the legal entity that is the employer . . . , and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee."

professional providers of financial reports who play only a "secondary" role in the preparation of the reports. According to the 6AC, under ADP's contract with Altour, ADP was charged with calculating employee wages in accordance with applicable laws. The inaccuracies in the earnings statements are alleged to have arisen from ADP's own conduct, not from errors in the time cards provided to ADP. Because ADP itself was allegedly responsible for the inaccuracies, its role regarding them was not merely "'secondary.'" (*Nutmeg Securities, Ltd. v. McGladrey & Pullen* (2001) 92 Cal.App.4th 1435, 1441-1442 [complaint stated negligent misrepresentation claim against auditor in view of allegations that auditor directly participated in creation of misleading financial statements]; see *OCM Principal Opportunities Fund*, *supra*, 157 Cal.App.4th at p. 857 [bank was subject to liability for negligent misrepresentation for offering memorandum prepared for another party because bank possessed reliable information establishing the falsity of financial forecasts contained in offering memorandum].) Furthermore, for the reasons discussed above (see pt. E. of the Discussion, *ante*), appellant was among the "specifically intended beneficiaries" of ADP's earnings statements "substantially likely to receive the misinformation." (*Murphy*, *supra,* 113 Cal.App.4th at p. 694.)

In an apparent effort to establish that appellant's earnings statements contained no inaccuracies supporting a negligent misrepresentation claim, ADP directs our

attention to appellant's opening brief, which states: "ADP received only a record of [appellant's] hours per day, generated by [appellant], and used that information to provide [appellant] with a paycheck and earnings statement on a semi-monthly basis. ADP had no ability whatsoever to determine whether [appellant] took or missed a meal or rest break, and calculated [appellant's] pay on the assumption that [appellant] never missed a break." However, immediately following that passage, appellant's brief states: "While [appellant's] time cards often showed that she worked in excess of 12 hours on various workdays and in excess of eight hours on the seventh consecutive day in a workweek, ADP *never* paid [appellant] double time for such work, in violation of IWC [Wage Order No.] 9-2001(3)(A)(1)(b) and Labor Code section 510."[9] That portion

---

[9] We observe that under the allegations in the 6AC, ADP undertook to calculate earnings in accordance with applicable laws. IWC Wage Order No. 9-2001(3)(A)(1) states in pertinent part: "Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than: [¶] . . . [¶] (b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek." IWC Wage Order No. 4-2001, upon which the 6AC also relies, contains an identical provision (see IWC Wage Order No. 4-2001(3)(A)(1)(b)).

34

of the opening brief sets forth the alleged inaccuracies in ADP's calculation of appellant's compensation that resulted in the underpayment of her wages. As explained above, because the earnings statements provided to appellant by ADP purported to -- but allegedly did not -- represent her accurately calculated compensation due, the 6AC states a claim for negligent misrepresentation.

ADP also suggests that the 6AC contains no allegations establishing justifiable reliance. We disagree. Generally, to plead a claim for negligent misrepresentation, a plaintiff must allege with sufficient particularity that he or she actually relied on the misrepresentation, as well as that such reliance was justifiable. (*Daniel v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1166-1168.) Reliance may be predicated on a theory of forebearance, that is, "the decision not to exercise a right or power . . . ." (*Small, supra,* 30 Cal.4th at p. 174.) Under such a theory, the plaintiff should ordinarily allege "actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations." (*Id.* at p. 184.) Additionally, to allege

Labor Code section 510 states: "Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee."

justifiable reliance under any theory, the plaintiff "must set 'forth facts to show that his or her actual reliance on the representations was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault.'" (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1066, quoting 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 732, p. 153.)  Reliance is justifiable when the "'circumstances were such to make it reasonable for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation.' [Citation.]  The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience. [Citation.]" (*OCM Principal Opportunities Fund*, *supra*, 157 Cal.App.4th at p. 864, italics omitted, quoting *Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1332.)

Aside from alleging in general terms that appellant reasonably relied on the earnings statements, the 6AC asserts that after appellant began her employment in 2005, she was paid twice monthly, and received earnings statements from ADP.  In 2010, she noticed disparities between her own records and her hours worked as reflected on her paychecks.  She then made her own wage calculations to verify deficiencies in the paychecks.  After she sought unpaid compensation, she was terminated.  Those allegations adequately plead actual reliance predicated on forebearance, as they show that appellant decided to claim additional compensation only after she became aware of

36

inaccuracies in the earnings statements. Until then, the "'circumstances were such to make it reasonable for [appellant] to accept [ADP's] statements without an independent inquiry or investigation'" (*OCM Principal Opportunities Fund, supra,* 157 Cal.App.4th at p. 864, italics omitted). Thus, in view of the relative complexity of the wage calculation, appellant's reliance on ADP's earnings statements until 2010 was justifiable. In sum, the 6AC states a claim for negligent misrepresentation against ADP.

G. *Professional Negligence Claim*

The 6AC contains a claim for professional negligence against ADP (fourteenth cause of action) predicated on allegations that ADP, as a payroll services provider, breached a duty of care owed to appellant, resulting in the underpayment of her compensation. Generally, "there are four essential elements of a professional negligence claim: '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]" (*Osornio v. Weingarten* (2004) 124 Cal.App.4th 304, 319, quoting *Budd v. Nixen* (1971) 6 Cal.3d 195, 200.) Here, the key question regarding appellant's claim is whether the 6AC adequately alleges that ADP owed a duty of care to her.

37

Privity of contract is required for the existence of such a duty of care, absent special circumstances.  (*Giacometti v. Aulla, LLC* (2010) 187 Cal.App.4th 1133, 1137 (*Giacometti*).)  *Biakanja v. Irving* (1958) 49 Cal.2d 647 is the leading case regarding those circumstances.  There, a notary public prepared a will for a client, but negligently failed to have it properly attested.  (*Id.* at p. 648.)  Following the client's death, the primary beneficiary under the will asserted a claim for negligence against the notary.  (*Ibid.*)  After the beneficiary secured a judgment in his favor, our Supreme Court examined whether the notary owed a duty of care to the beneficiary, notwithstanding the absence of a contract between them.  (*Id.* at pp. 648-651.)  The court stated:  "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm."  (*Id.* at p. 650.)  Under that test, the court concluded the beneficiary was entitled to recover against the notary, despite the absence of privity.  (*Id.* at p. 651.)

In *Bily*, the Supreme Court concluded that under the multi-factor test set forth in *Biajanka,* auditors playing a "secondary" role in preparing financial reports for a client

owe no duty of care to third parties not in privity of contract with the auditors.  (*Bily*, *supra*, 3 Cal.4th at pp. 402, 396-407.)  As the court explained, auditors acting in that role are ultimately dependent upon the information supplied by their client, and have little or no control over to whom the client distributes their reports.  (*Id*. at pp. 400.)  The court determined that three considerations conclusively weighed against the imposition of a duty of care:  (1) that recognition of such a duty exposed an auditor to "potential liability far out of proportion to its fault," in view of its "secondary 'watchdog' role"; (2) that the "generally more sophisticated class of plaintiffs in auditor liability cases (e.g., business lenders and investors) permit[ted] the effective use of contract rather than tort liability to control and adjust the relevant risks"; and (3) that the imposition of tort liability was likely to increase the costs and reduce the availability of auditing.  (*Id*. at p. 398.)  Regarding item (3), the court concluded that the imposition of liability would not yield greater accuracy "without disadvantage," in view of the "labor-intensive nature of auditing," which creates a report through "a complex process involving discretion and judgment on the part of the auditor at every stage."  (*Id*. at pp. 400, 404.)  In view of that complexity, the court noted, few audits are immune from criticism.  (*Id*. at p. 400.)  Greater vulnerability to litigation was therefore likely to reduce the availability of auditing services.  (*Id*. at p. 404.)

The court thus held that "an auditor's liability for general negligence in the conduct of an audit of its client's

financial statements is confined to the client, i.e., the person who contracts for or engages the audit services.  Other persons may not recover on a pure negligence theory." (*Bily*, *supra*, 3 Cal.4th at p. 406.)  Nonetheless, in a footnote accompanying that holding, the court stated:  "In theory, there is an additional class of persons who may be the practical and legal equivalent of 'clients.'  It is possible the audit engagement contract might expressly identify a particular third party or parties so as to make them express third party beneficiaries of the contract.  Third party beneficiaries may under appropriate circumstances possess the rights of parties to the contract.  [Citations.]" (*Id.* at p. 406, fn. 16.)  Noting the case presented no third party beneficiary issue, the court declined to further address the issue.  (*Ibid.*)

Here, we confront the question not resolved in *Bily*, namely, whether a financial services provider may be subject to a duty of care to a third party beneficiary of the contract between the provider and its client.  In our view, under the facts alleged in the 6AC, ADP owed a duty of care to appellant, for purposes of a professional negligence claim.  As explained below, that conclusion relies on three considerations:  (1) that under the 6AC's allegations, appellant is a creditor beneficiary to the contract between Altour and ADP with respect to wage-related duties that Altour owed appellant; (2) that the *Biajanka* factors weigh in favor of recognizing a duty of care; and (3) that the

40

considerations identified in *Bily* as precluding the imposition of such a duty on auditors are not present here.

In view of appellant's status as a creditor beneficiary, she is reasonably regarded as "the practical and legal equivalent" of a party to the contract between Altour and ADP. (*Bily, supra,* 3 Cal.4th at p. 406, fn. 16.) Generally, creditor beneficiaries may enforce the terms of the contract made for their benefit to the extent the promissee is authorized to do so. (*Mercury Casualty Co. v. Maloney* (2003) 113 Cal.App.4th 799, 802 ["A person who is not a party to a contract may nonetheless have certain rights thereunder, and may sue to enforce those rights, where the contract is made expressly for her benefit"]; *Johnson v. Holmes Tuttle Lincoln-Merc.* (1958) 160 Cal.App.2d 290, 296 ["While the contract remains unrescinded, the relations of the parties are the same as though the promise had been made directly to the third party [beneficiary]"].) Accordingly, to the extent the contract obligated ADP to discharge Althour's pre-existing wage-related duties to appellant, she is authorized to enforce that contractual obligation against ADP.

Furthermore, the *Biajanka* factors weigh in favor of recognizing a duty of care. The contract between Altour and ADP was intended to affect all Altour employees, including appellant, and harm to them was manifestly foreseeable upon ADP's alleged failure to determine their wages in accordance with applicable laws. For the reasons discussed above (see pt. E. of the Discussion, *ante*), appellant's injuries

were certain and closely connected with ADP's alleged conduct, as ADP was engaged both to calculate her earnings and to provide earnings statements reflecting the wages due; her failure to received the compensation owed her was attributable to ADP's own alleged errors. That underpayment must be regarded as significant, as "'it has long been recognized that . . . because of the economic position of the average worker . . . , it is essential to public welfare that he receive his pay when it is due." (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 326, quoting, *In re Trombley* (1948) 31 Cal.2d 801, 809-810.) Furthermore, recognizing a duty of care encourages accurate payment of wages. (See *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110-112 [law firm engaged by clients to prepare an opinion letter to be shown to bank in order to secure loan from bank owed a duty of care to bank].)

The considerations set forth in *Bily* barring the imposition of a duty of care on auditors are not present here. According to the allegations in the 6AC, ADP did not occupy a "secondary 'watchdog' role" (*Bily*, *supra*, 3 Cal.4th at p. 398), but was contractually obligated to carry out Altour's wage-related legal duties to its employees; the key misconduct asserted against ADP stemmed from its own alleged errors. Furthermore, the imposition of a duty of care on ADP does not render it vulnerable to potentially open-ended liability, as the class of potential plaintiffs is limited to Altour's employees. That class also differs markedly from

42

the potential plaintiffs in *Bily* in terms of financial sophistication. Finally, payroll preparation, though complex, "is largely a ministerial task" carried out by an employer's internal payroll department or an outside provider. (*Futrell*, *supra*, 190 Cal.App.4th at p. 1432.) For the reasons discussed above (see pt. D.1. of the Discussion, *ante*), the tasks undertaken by ADP do not involve the complex exercises of discretion akin to those involved in audits, which are thus frequently open to criticism. Accordingly, the rationale in *Bily* linking the imposition of liability to a significant reduction in the availability of auditing services is inapplicable here.

The decisions upon which ADP relies are distinguishable. In *Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 570-571, a partnership retained an accountant to provide accounting services, including a calculation of each partner's profit allocation in the partnership. In making that determination, the accountant employed the method of calculation specified by the partnership. (*Id.* at p. 580.) On the basis of that calculation, the partnership bought out the interest of one of the partners, who later sued the accountant for professional negligence. (*Id.* at pp. 571-572.) Affirming summary judgment on that claim in favor of the accountant, the appellate court concluded that the claim failed for want of a duty of care running from the accountant to the partner. (*Id.* at pp. 580-581.) The court determined that no duty arose under *Biajanka* because the accountant had merely carried

43

out -- accurately -- the calculation specified by the partnership. (*Id*. at pp. 581-583.) In addition, the court determined that the contract between the partnership and the accountant established no accountant-client relationship with the aggrieved partner. (*Id*. at pp. 582-585.) In contrast, under the 6AC's allegations, appellant was a third party creditor beneficiary of Altour's contract with ADP, and it was ADP's alleged errors that resulted in appellant's insufficient compensation.[10]

---

[10] Those allegations also distinguish *Giacometti*, which ADP does not discuss. There, a restaurant hired an accounting firm to prepare year-end documents required by the Internal Revenue Service regarding employee earnings. (*Giacometti*, *supra*, 187 Cal.App.4th at pp. 1135, 1139.) The firm prepared employee W-2 forms on the basis of information provided by the restaurant concerning wages and tips. (*Id*. at p. 1139.) Several employees asserted a claim for professional negligence against the firm, alleging that their W-2 forms overstated their income because the information provided by the restaurant to the firm included tips not received by them. (*Id*. at pp. 1135-1136.) After the trial court sustained a demurrer to their complaint without leave to amend, this court affirmed, determining that under *Biajanka* and *Bily*, it alleged no duty of care. (*Id*. at pp. 1137-1141.) In so concluding, we observed that the restaurant's intention in hiring the firm was to discharge its legal obligation to the Internal Revenue Service, not to benefit the employees, and that the firm had no "primary role in the harm," as it had been hired merely to prepare documents based on the information provided to it by the

44

In *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 339, an attorney engaged by a corporation misadvised its officers regarding the legality of a sale of shares. The shares were purchased by the plaintiffs, who later learned that the sale was unlawful, and asserted a claim for professional negligence against the attorney. (*Id.* at pp. 340-341.) After a demurrer to the claim was sustained without leave to amend, our Supreme Court concluded that the attorney owed no duty of care to the plaintiffs, as they had no relationship to the corporation or the attorney other than as purchasers of the shares. (*Id.* at pp. 343-345.) That is not true here, as Altour hired ADP to assist in discharging its legal duties to employees such as appellant. In sum, the 6AC states a claim for professional negligence against ADP.

H. *False Advertising Claim*

We turn to the 6AC's claim against ADP under the False Advertising Law (FAL) ( Bus. & Prof. Code, § 17500 et seq.; seventeenth cause of action). As explained below, that claim fails for want of allegations establishing her standing to assert it.

The FAL makes it unlawful for any person or corporation, acting with the intent to perform a service or "induce the public to enter into any obligation relating" to

restaurant. (*Id.* at pp. 1139-1141.) As explained above, the 6AC alleges that Altour relied on ADP to do the appropriate calculations based on data ultimately supplied to ADP by employees like appellant.

that service, to disseminate a statement by means of advertising that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." (Bus. & Prof. Code, § 17500.) Claims under the FAL, like claims under the UCL, are subject to the requirements imposed under Proposition 64, which the voters of California approved in November 2004. (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227.) Proposition 64 amended the FAL and the UCL to limit standing to assert claims to any "'person who has suffered injury in fact and has lost money or property as a result of'" a violation of the FAL or the UCL. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 321 (*Kwikset*).)

"To satisfy these requirements at the pleading stage a plaintiff must allege facts showing that he or she suffered an economic injury *caused by* the alleged violation. [Citation.] Because 'reliance is the causal mechanism of fraud' [citation] this requires pleading facts showing actual reliance, that is, that the plaintiff suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations. [Citation.]" (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 228.)

Here, the 6AC contains no allegations establishing the requisite reliance. The 6AC alleges that ADP disseminated many untrue or misleading statements by means of advertising and the internet. According to the 6AC, those statements related to ADP's provision of payroll tools and

services to employers and employees to ensure compliance with applicable laws, and ADP's partnership or joint venture with the Altour defendants for the purpose of handling its payroll, maintaining its records, and safeguarding confidential employee information. The 6AC describes ADP's purportedly misleading statements, but does not allege that appellant actually saw them. Although the 6AC asserts that appellant "logged directly into an ADP system to track her earnings," it contains no allegations that she was exposed to the misleading statements through that system (or in some other way) or that they affected her conduct. In the absence of such allegations, the 6AC's assertion that the misrepresentations caused injury to appellant are insufficient to plead reliance.

Appellant contends those allegations are inessential to her claim. Pointing to *Kwikset*, she argues that the phrase "as a result of," as employed in the FAL and the UCL, requires a showing of a causal connection *or* reliance on the alleged misrepresentation. She asserts that "of these options, she can show a causal connection, rather than reliance."

In our view, appellant's contention reflects a misapprehension of *Kwikset*. There, in the context of examining a false advertising claim under the UCL, our Supreme Court discussed the meaning of the phrase "'as a result of,'" for purposes of the FAL and the UCL. (*Kwikset*, *supra*, 51 Cal.4th at pp. 326-327.) After noting that in *Hall v. Time, Inc.* (2008) 158 Cal.App.4th 847, 855 (*Hall*), the

47

appellate court construed that phrase to require "'a showing of a causal connection or reliance on the alleged misrepresentation,'" the court in *Kwikset* set forth the "controlling" analysis, which it attributed to its prior decision in *In re Tobacco Cases II Cases* (2009) 46 Cal.4th 298 (*Tobacco Cases II*). (*Kwikset, supra*, at p. 326.)

The court in *Kwikset* stated: "Recognizing that 'reliance is the causal mechanism of fraud' [citation] we held that a plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions.' [citation.]" (*Kwikset, supra*, 51 Cal.4th at p. 326, quoting *Tobacco Cases II Cases, supra*, 46 Cal.4th at pp. 306, 326.) In a footnote, the court explained: "'Reliance' as used in the ordinary fraud context has always been understood to mean reliance on a statement for its truth and accuracy. [Citation.] . . . It follows that a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made. [Citation.] . . ." (*Kwikset, supra*, 51 Cal.4th at p. 327, fn. 10.)

The court pointed with approval to *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1363-1364 (*Durell*), which involved a UCL class action against a hospital predicated on a fraudulent business practice. (*Kwikset, supra*, 51 Cal.4th at p. 327.) The class plaintiff's complaint

alleged that the hospital's Web site and services agreement contained misrepresentations regarding the fees charged uninsured patients for medical services.  (*Durell, supra,* 183 Cal.App.4th at pp. 1361-1362.)  Although the complaint alleged that the plaintiff had suffered damages as a "'proximate result'" of the misrepresentations, it contained no allegation that he ever saw them or relied on them.  (*Id.* at p. 1363.)  After a demurrer to the complaint was sustained without leave to amend, the appellate court affirmed.  (*Id.* at pp. 1362-1364.)  In so concluding, the court rejected a contention based on *Hall* that a simple allegation of causation sufficed for a UCL claim, stating that *Tobacco Cases II* required an allegation of reliance.   (*Id.* at pp. 1363-1364.)

In view of *Kwikset* and *Durell,* the 6AC lacks the requisite allegations of reliance, and appellant otherwise acknowledges that she cannot cure that deficiency. Accordingly, the 6AC states no claim under the FAL.

I.  *UCL Claims*

The 6AC contains two claims under the UCL against ADP, one of which (fifteenth cause of action) relies on the misconduct alleged in connection with the claims for negligent misrepresentation, negligence, and violations of the FAL, and the other of which (sixteenth cause of action) relies on the misconduct alleged in connection with the claims based on the theory that ADP was appellant's employer.  Generally, the UCL defines "unfair competition"

49

broadly to include "any unlawful, unfair or fraudulent business act or practice."  (Bus. & Prof. Code, § 17200.)  Under the UCL, damages cannot be recovered, and plaintiffs are generally limited to restitution and injunctive relief.  (*Clark v. Superior Court* (2010) 50 Cal.4th 605, 610.)  As explained below, the allegations in the 6AC fail to adequately state these claims.

First, we conclude that the 6AC alleges no unlawful or unfair business practice.  Generally, "[b]y proscribing 'any unlawful' business practice, '[the UCL] "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.  [¶] . . . [¶] However, the law does more than just borrow.  The statutory language referring to "any unlawful, unfair *or* fraudulent" practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law."  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).)

Liability for unlawful and unfair practices is subject to a restriction traceable to *Cel-Tech*, which involved UCL claims relating to the marketing of consumer goods and services.  The court concluded that for purposes of the type of UCL claim presented to it, the public policy necessary to establish an unfair practice must be closely tied to a statute.  (*Cel-Tech, supra,* 20 Cal.4th at p. 187.)  Following *Cel-Tech*, at least one appellate court has concluded that in any UCL action, the public policy underlying an alleged unfair

practice "must be 'tethered' to specific constitutional, statutory, or regulatory provisions." (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854.)

In *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, the appellate court applied that limitation to a UCL claim arising in circumstances closely resembling those presented here. There, a franchisor of convenience stores imposed a contractual obligation on franchisees to obtain payroll services from the franchisor. (*Id.* at pp. 1180-1181.) A franchisee's employee asserted a UCL class action against the franchisor, alleging that its payroll system did not fully compensate franchisee employees for their work. (*Aleksick, supra,* 205 Cal.App.4th at pp. 1180-1181.) When the franchisor secured summary judgment on the claim, the appellate court affirmed, concluding that because the franchisor was not the class members' employer, the UCL claim failed for want of a cognizable unlawful or unfair practice under the Labor Code, as the franchisor was not subject to the wage-related duties imposed on employers under that code. (*Aleksick, supra,* at pp. 1185-1193.)

Likewise, the 6AC fails to allege an unlawful or unfair practice. As explained above (see pt. D. of the Discussion, *ante*), the labor laws and wage orders identified in the 6AC are not applicable to ADP. For that reason, the alleged misconduct by ADP does not violate the public policy underlying them.

Additionally, we conclude that the 6AC alleges no fraudulent practice entitling appellant to relief under the

UCL.  To the extent the UCL claims rely on the alleged false advertising attributed to ADP in connection with the FAL claim, the UCL claims fail for the same reason as the FAL claim, namely, insufficient allegations of reliance. Furthermore, to the extent the UCL claims rely on the misrepresentations in appellant's earnings statements, as alleged in connection with the negligent misrepresentation claim, the claims fail for want of any allegation that ADP derived a benefit from the misrepresentations supporting a restitutionary recovery.

In *Bradstreet v. Wong* (2008) 161 Cal.App.4th 1440, 1444, abrogated on another ground in *Martinez*, *supra*, 49 Cal.4th at page 50, footnote 12, three corporations hired an accountant to perform bookkeeping and payroll work for them.  When the corporations failed to pay wages owed their employees, litigation ensued in which two employees and other parties asserted a UCL claim against the corporation's owners and the accountant.  (*Bradstreet, supra,* 161 Cal.App.4th at pp. 1444-1448.)  When the accountant secured a judgment in her favor on the claim, the appellate court affirmed, concluding there was no basis for a restitutionary recovery against her because she derived no benefit from the unpaid wages.  (*Id.* at pp. 1458-1463.)  That rationale applies here, as the 6AC contains no allegation that ADP derived a benefit from appellant's unpaid wages for which she may seek restitution.  In sum, the 6AC states no UCL claim.

J. *Aiding and Abetting Claim*

Appellant contends she is entitled to assert a claim for aiding and abetting against ADP.  Although her opening brief discusses that theory of joint liability and the 6AC's caption page refers to an aiding and abetting claim as the nineteenth (and final) cause of action, the 6AC contains no such claim.  Appellant's reply brief states that the omission was inadvertent, and directs our attention to the aiding and abetting claim in the 5AC.  As explained below, appellant has failed to show she can state a tenable aiding and abetting claim.

Generally, "[t]he burden of showing that a reasonable possibility exists that amendment can cure the defects [in a complaint] remains with the plaintiff; neither the trial court nor this court will rewrite a complaint.  [Citation.]" (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44.)  To carry that burden, appellant "must clearly and specifically set forth the 'applicable substantive law' [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it.  Further, [she] must set forth factual allegations that sufficiently state all required elements of that cause of action.  [Citations.] Allegations must be factual and specific, not vague or conclusionary.  [Citation.]" (*Id.* at p. 43.)

Aiding and abetting, though similar to conspiracy, involves distinct elements.[11] (*American Master Lease*, *supra*,

---

[11]    "Civil conspiracy is 'a legal doctrine that imposes liability on persons who, although not actually committing a

53

225 Cal.App.4th at p. 1475.)  "Liability may . . .  be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.  [Citations.]"  (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 846.)  Unlike a conspirator, an aider and abettor need not be capable of the target tort.  (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144, fn. 2.)  To plead aiding and abetting by a defendant, the plaintiff must allege that the defendant had actual knowledge of the "specific primary wrong" being committed, and gave substantial assistance to the wrongful conduct.  (*Id.* at pp. 1145, 1146-1147; *Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343-344

---

tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.  [Citation.] . . . .' [Citation.]  'By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty."  (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1473-1474 (*American Master Lease*), quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.)

54

(*Nasrawi*).)

As alleged in the 5AC, the aiding and abetting claim is the final cause of action, and incorporates all the previous factual allegations. The claim's material additional allegations are (1) that Altour and ADP "formed a common plan to pay Altour employees unfairly," (2) that they knew that appellant was not being paid in accordance with California law, (3) that "ADP knowingly aided and abetted Altour in committing the wrongful termination," (4) that ADP gave substantial assistance or encouragement to Altour, and (5) that ADP's conduct was a substantial factor in causing harm to appellant.

Appellant has failed to show that she can state an aiding and abetting claim against ADP with respect to unpaid wages. Generally, aiding and abetting requires the commission of an underlying tort. (*Nasrawi, supra*, 231 Cal.App.4th at p. 344, fn. 7.) Although her briefs refer to two potential torts -- namely, conversion and "theft" -- the 5AC and 6AC assert no such claims against Altour, and she offers no argument (with citation to legal authority) that the misconduct alleged in them constitutes those torts.

Appellant also has forfeited any contention that she can state an aiding and abetting claim against ADP with respect to the alleged wrongful termination, as her briefs contain no argument in support of that claim. We also point out that an aider and abettor must "'provide assistance that was a substantial factor in causing the harm suffered'" (*American Master Lease, supra*, 225 Cal.App.4th at p. 1476,

quoting *Neilson v. Union Bank of California, N.A.* (C.D. Cal. 2003) 290 F.Supp.2d 1101, 1135).  Thus, "'causation is an essential element of an aiding and abetting claim . . . .'" (*American Master Lease*, *supra,* at p. 1476, quoting *Neilson*, *supra*, at p. 1135.)  However, as neither the 5AC nor the 6AC contains specific allegations describing how ADP assisted in or encouraged her termination, appellant has failed to plead the requisite causation.  (*Schulz v. Neovi Data Corp.* (2007) 152 Cal.App.4th 86, 97 [aiding and abetting claim fails for want of specific factual allegations showing substantial assistance or encouragement].)  In sum, appellant had failed to demonstrate a tenable aiding and abetting claim.

**DISPOSITION**

The judgment is reversed to the extent the trial court denied appellant leave to file an amended complaint asserting claims against respondents limited to breach of contract, negligent misrepresentation, and negligence, as set forth in our opinion (see pts. E., F. & G. of the Discussion, *ante*).  The judgment is affirmed in all other respects.  The parties shall bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


MANELLA, J.


We concur:




EPSTEIN, P. J.




WILLHITE, J.



57